Please the court, Vincent Slavens on behalf of appellants. This is a securities fraud class action involving 10b-5. There's an issue that I wanted to address with the court, particularly raised by the defendants, and that is the rule of completeness. I think one of the core issues in this case is whether the rule of completeness applies or whether the requirement or the duty to disclose applies. As set forth in SEC v. Capital Gains Research Bureau, the 34 Act which is involved here embraces a fundamental purpose to substitute the philosophy of full disclosure for the philosophy of caveat emptor, and thus to achieve a high standard of business ethics in the securities industry. Where wasn't there full disclosure here? Well, there was a reference to what we call a CC agreement, a cross-collateralization agreement. Yeah. And that cross-collateralization agreement, it turns out, involves the financing of two separate properties. Two separate ones, yeah. And there was no disclosure to investors of the risks of that agreement or of the obligations involved in that agreement. The two other properties, they may have been underwater. They may have had trouble making their payments. All of this information was material in order for investors to determine the risks involved in investing. But look, right on the first page it says, the interest offered hereby are highly speculative, illiquid, involve a high degree of risk, and should be purchased only if you can afford to lose your entire investment. See risk factors. It talks about how the property was acquired as part of a portfolio of assets in the Houston area, total acquisition price. They give everything there. And then they I don't want to read all of this, but and then they use they tell the investor about cross-collateralization, right? Correct. And if I look at my iPhone, push cross-collateralization gives you the whole thing. I mean, it's not an uncommon term. And it tells you that The question I have, Your Honor, is Let me go back to what you raised. Don't we have clear law in the circuit that there isn't a rule of completeness, there's only a rule of misrepresentation? Exactly. Brody says there is no rule of completeness, and we don't dispute that. So what's the misrepresentation here? The misrepresentation is the fact that you have all of these risk disclosures Right. set forth in the PPM which the investors are relying on. Which of them is false in your allegation? They don't have risk disclosures about the cross-collateralization agreement. There's nothing in there that says if the cross-collateralization agreement is not released, then you face these additional risks. But that gets you back to the problem that what you're asking for is more of the same. You're not really saying that anything that is said here is false. Nothing that was said in the as I understand your argument, nothing in the disclosure statement is actually false. You just want more elaboration on what cross-collateralization means. That sounds like what you're asking for. Well, there's a requirement, a duty to disclose on an issuer to disclose material information to investors. And that material information, we argue, includes risk disclosures regarding the CC agreement. Right. And twice, I think twice in the disclosure, it mentions the cross-collateralization agreement. And there's the bolded language that Judge Pragerson read that starts off the entire document saying, hello, you could lose everything because this is really, really risky. So, I guess, maybe, really, I'm asking about scienter, but it seems to me I'm also asking about misrepresentation as to what is in this that is a material omission. Well, I think what you're getting to is the bespeaks doctrine, which basically says that if a projection is made, then cautions are given and risks are disclosed. That protects against any security fraud claim. To me, it seems to me that, I don't understand you to be arguing, although I would wonder about whether there was a misstatement. When somebody says the company is in the process of obtaining a release from such agreement, does that mean we're trying to obtain a release from such agreement or we have essentially, I would have thought it meant, we have a release in principle and we're just working out the details. Exactly. That is one issue that we raise is that they talk about a process, they don't say what the likelihood of the process is to be completed. But they don't say we're in the process of trying to obtain a release from such agreement. Yeah, they say they are in a process, meaning that, to me, that means that a process has begun and it would likely be completed. A case that I found similar to that was cited in Brody, which is a McCormick case. In that case, the employee had sold the stock back to the company and the company notified him that there was a possible suitor to purchase the company and that the stock, what they did in addition to telling him about the process of a potential purchaser coming in and buying the company, they also advised him that the risk is that the company's stock could go from the 30s up to 50. And so they disclosed all of that to the plaintiff and the court in that case, in rejecting the plaintiff's claim, made a specific note of that in identifying other district court cases that allowed for claims such as his, but noted that it also made consequences of the projected deal very clear. The market value of McCormick securities would rise dramatically. That's what's missing in this case, is they talk about a process, but they don't warn the investors about what happens if that process doesn't go through, what happens if... Well, it says it's a cross-default and cross-collateralization agreement. I mean, I'm not sure I would have known what that meant before I read the briefs in this case, but if I was an investor, I would at least either know or find out that it means that if there's a default that the collateral on the loan as to this property is also the other property and vice versa. That tells you what the consequences are. Not necessarily, because you could have the other properties completely be underwater on their mortgages and not able to make their payments. That would make that a much riskier agreement. If they had full occupancy and their equity was 50%, that would make it a much less risky investment. So the question is, would that information change or alter the total mix of information given to investors? I submit that it would. It's something that investors should know, and in fact, if you look at the PPM, they give extensive information about the property that they're actually investing in, the exact type of information that we're claiming they should have included about the CC agreement. Where is the obligation to give the information in the first place? It's separate from 10b-5, but where is it from? That's like McCormick's cites to it. It's out of affiliated use. If there's a relationship. No, I'm asking you, why do they put out this 100-page prospectus to begin with, with all the risk factors and so on? To inform and disclose. I'm sorry? To inform and disclose. Because there's a legal requirement that they do so. There is, as an issuer of securities, they have a duty to disclose material information. Yes. Right. Okay. And that's an affiliated use, as well as McCormick's cite refers to it. But that's separate from 10b-5. That's. Whatever obligation. 10b-5 deals with manipulation, deceit, and so on. The obligation affirmatively to disclose is not the subject of a private cause of action, or isn't in this instance? It's covered under 10b-5. 10b-5 involves both misrepresentations affirmative, as well as omissions where there is a duty to disclose. And so if they have a duty to disclose under 10b-5, as an issuer, which they do, then they have an obligation to put forth material information to the investor to advise them of the material information about the investment. And why does Brody, which I wrote, say that it isn't misleading, does not create section 10b-5b, does not create an affirmative duty to disclose any and all material information? Well, Brody involved a press release. And the press release involved the repurchase program. I'm not asking you that. I don't care what Brody was about. There were statements made. 10b-5 prohibits only misleading and untrue statements, not statements that are incomplete. Is that wrong? Should we eliminate Brody? It's not necessarily wrong because the press release is not an offer of securities. They're not selling securities. Under the securities law, an omission must be misleading. In other words, it must affirmatively create an impression of a state of affairs. That's all wrong? The duty to disclose arises out of a transaction. I'm, as an issuer, in a transaction. So are you arguing then that Brody is just irrelevant here because you have a different cause of action based on the fact that this is the securities offering and that there is a duty, an affirmative duty to disclose and omissions are actionable? Is that your argument? That's the argument, yes. And it isn't true, therefore, that only misleading statements are actionable in this context? I certainly didn't get that out of your brief, but is that what you're arguing? If there's a duty to disclose, if you're under affiliated, there was a duty to disclose where the bankers were turning around and selling the corporation's stock for a higher value than they were paying for it. And under affiliated youth, they found that they were acting more than just as a market maker or whatever. They were acting on behalf of the affiliated youth, and therefore they had a duty to disclose that fact to them. It was an affirmative duty, and it's a duty to disclose material facts under basic. And so that's in part what this case is about. Is it required to get approval of the SEC before one of these documents goes out? I don't think so, but is it? I'm sorry? This piece of paper called Confidential Private Placement Memorandum, was this passed by the SEC before it went out? I don't believe so. I believe it was issued under a private offering exemption, which would not be required to be reviewed by the SEC. It's not a registered offering. Now, so did all the investors put in the same amount of money? Investors put in various amounts of money, but generally speaking, around the same level as the plaintiffs did. That's about what, $7 million? A little over $7 million, yes. A little over $7 million.  Well, the offering was. . . It went out to financial advisors? Yeah, what happened is Geneva is the issuer. Berkel Fisher was, as we allege, the underwriter. And they have a network of broker-dealers throughout the country that have clients, and they offered them to their clients, yes. I'm looking at your brief, and as far as I can tell, your brief doesn't have any theory other than a misrepresentation or misleading theory. This doesn't seem to be based on any. . . I mean, I do not understand that there's any affirmative disclosure theory, but you don't seem to have one. In the reply brief, we discuss the duty to disclose. And throughout our brief, we talk about the fact that risk disclosures were not made to investors. Disclosures about the risk of investing relating to the CC agreement. And as far as the broader risks that you talk about, the risks that you could lose all of your money, those are common disclosures, common risk representations that are made in these offerings. But it doesn't give. . . The investors have to understand what the actual risks are so they can determine the probability of them losing all their money. The issue of the cross-collateralization was really part of the short-term loan issue generally. And there's a fairly lengthy section on the risks related to financing that starts at ER 81. And it seems to me that this entire section is just full of warning that there's some potentially grave risks related to the financing. And so this piece of it that you've pulled out is really only a piece of the issues related to the short-term loan. And I guess in context, I don't understand why it isn't sufficient as really just part of the laundry list of problems with the short-term financing. Well, it's kind of like if you have a mortgage on your house and it turns out you also have a mortgage on another house that you're responsible for that eats up basically all the equity that you put in. I understand that it's different. But if what I tell you in regard to that is I have a bunch of problems related to financing my house. One is I've got this other house and they're cross-collateralized. And another one is that values are falling and it's underwater. And another one is this and another one is this. And you list four or five of these. The failure to sort of expand upon one of them doesn't really eliminate the conveyed sense that there's a big issue. And I guess that's what I'm struggling with. Right, and the problem that investors have is that they're reading those risk disclosures that they're being given and they've assessed those risks and they assess the probability of those risks. This cross-collateralization agreement is a much larger risk. It's a much larger risk because it wipes out their entire equity if it comes to pass. Look, the guys that sell these things here, they sell $7,463,000, selling commission and expenses. Look at that, $653,018. Yes. That's pretty good commission, isn't it? For one sale. Now, they have a responsibility too, don't they? Yes, and they are... They're representing a client. They are defended in the case. Yeah, all of them. With regard to the Center... No, not all of them, Your Honor. Just the Berthel Fisher, who is the underwriter. I'm sorry? If there were... I find, I'm looking at your reply brief and I find the argument a little confusing because you say, on the one hand, you're not arguing for a rule of completeness. On the other hand, you're arguing for a duty to disclose. Putting that aside, what is the Center required in your theory of the case? Well, it's under TELADS, which is you have to allege a... Intent to deceive. Intent to deceive that is at least as compelling or cogent as... But that's different from a duty... I mean, first of all, that doesn't seem to match up with a duty to disclose at all. I mean, you could... But... So then, why would we reach that conclusion on at least a strong... Inference. Inference on this record? All you allege, as I recall, is they had an economic incentive, which we've discussed. And... You said one other thing that I can't remember. Oh, that... You had one other point. I can't remember what it was. Yeah, well... As to the cross-collateralization agreement. Yeah. What TELADS has said is that... They mentioned that a financial incentive can be a very compelling... I understand that. And then what else do you know? ...reason for Center. But on the other aspect of it, they knew the details of the CC agreement. They knew what was going on at the other properties, and they obviously decided not to disclose that information. Because they didn't. And so, not only... You know, they knew that they didn't disclose it. They knew it was material, important to investors. And they didn't disclose it. And in addition to that, they're receiving a financial benefit from selling the property. But ultimately, you have to allege they did this essentially in order to induce people... We do. We do allege that. So, you're talking about they as... You know, let me finish my... Bethel Fisher. Berkel Fisher was the underwriter. The underwriter. Yes. And Geneva was the issuer. What about the guys that sold this? The individual brokers who sold it? Yeah. Yeah, they're not named in the suit. Are you going after them? Well, the issuer is really the wrongdoer from our perspective. They're the ones that knew about the cross-collateralization agreement and didn't include the information in the cross-collateralization agreement. Yeah, but you have these guys hustling this stuff. And if they sell one, they make $653,000. So, they got a big conflict of interest, huh? That's Berkel Fisher that we allege receives that money as the underwriter. That's the underwriter that receives that money. Right. Well, what did the brokers get? I believe Berkel Fisher had the authority to share that with them. I don't know if... I'm sure that they did. So, they got a cut of that too? Perhaps, yes. Well, somebody had to sell it to your clients. And I believe there have been individual cases brought against the brokers for suitability claims, this sort of thing. And they would have to be brought in arbitration in FINRA, which this is a class action against the issuer and the underwriter.  And this went on for a while. This came out on March the 25th, 2008. I'm sorry? This memorandum is dated March the 25th, 2008. Correct. When did the bubble break about that time, huh? 2009, I believe, September. There was a letter from the lender informing investors that the other properties had failed to pay and that they were foreclosing on the Beamer plate. But when did all these... when did the market start to tank? When did the real estate market start to tank? Yeah, yeah. I think I noticed it myself probably in the middle of 2008. It may have been earlier than that, but not that I noticed. Okay. Any further questions? Not for me. Okay. I've gone over my time, so hopefully I might have a chance to rebut if possible. All right. I'll probably give you some time. Thank you. Good afternoon, Your Honors. May it please the Court. My name is Christina Semmer, and I represent defendants appellees Geneva Exchange, Inc., Geneva Exchange, LLC, and Duane Lund. I will address the Court for about 10 to 12 minutes, and then Counsel for Berthel Fisher will use the remaining time. As the panel has discussed in the appellant's opening statements, this case is not really about whether or not the information that was provided in the private placement memorandum was false. The plaintiffs have acknowledged that the cross-collateralization agreement was disclosed. They admit that Geneva was in the process of obtaining a release of that agreement. They admit the private placement memorandum... What does it mean to be in the process of obtaining a release? Simply put, it means that it has not yet been achieved, but that Geneva is undertaking efforts to get it released. That's not what I would understand it to mean. I think that, Your Honor, if it was guaranteed to be released, which is... No, that's not even what I would understand it to mean. I would understand it to mean essentially, you know, we have... We need to cross the T's and dot the I's, but we have every reason to believe this is happening. We're just working out the details. And I think that is correct, Your Honor. And plaintiffs have not alleged otherwise. They, in fact, have admitted that Geneva was in the process of obtaining the release. And I think there is support in the record. It wasn't just Geneva's unreasonable belief that this was going to happen at some point in time. I will direct Your Honors to the mortgage commitment letter, which was from Prudential, which was the entity that gave the short-term loan on the property. And in that mortgage commitment letter, Prudential says that it is contemplating a release of the cross-collateralization agreement. They're the entity that would have benefited the most from the existence of this cross-collateralization agreement. So for them to say, we think this is going to happen, suggests that, one, it is going to happen, and, two, that Geneva reasonably believed that it was going to happen. If they're contemplating something, it means it's going to happen. Pardon me? If they're contemplating it, that means it's going to happen. I think that it suggests that they are actually negotiating the terms of it. The exact disclosure is subject to to-be-negotiated release provisions. So I think all parties believed that they were negotiating this was likely to happen and was going to happen. Unfortunately, the market collapsed. And, of course, why would Prudential in the end want to release something when, you know, they are able to have collateral of three properties? So I don't think that there is any implication in the term in the process of obtaining release. It means that it is either likely or guaranteed to happen. I was trying to think of some analogous situations. And if I said I'm in the process of obtaining my law degree, that is not a guarantee that I'm definitely going to graduate from law school and become a lawyer. If I say I'm in the process of looking for a home to buy, that doesn't mean that I'm definitely going to find a home or that I'm going to buy a house. It just suggests that this was in the process of happening and plaintiffs have admitted that it was. And I think even... You have to look at that language in the full context of this entire transaction. I mean, when I first read it, it sounded to me that, well, we're in the process of taking care of this. It's like, well, don't worry. We'll get it done. Something like that. I think to the extent that it suggests that a release was likely to happen, the plaintiffs have not alleged any facts to suggest it wasn't likely to happen. And, again, I would just point the Court to the prudential statement that everyone believed that it was going to happen. And plaintiffs have not suggested that at the time they made their investment that a release was not likely. Separately and independently of the short-term loan. There were two ways that the cross-collateralization agreement could be released. It was attached to the short-term loan, which meant that once the short-term loan was refinanced, it could go away and would definitely go away if the short-term loan was refinanced. But Geneva was also separately trying to obtain a release independent from the short-term loan. I mean, what's odd about the document is that it goes, despite the fact that less than until that happened, this investment could fail and ultimately did fail if these separate projects went under. There's nothing at all revealed about those separate projects. And yet there's a great deal revealed about the risk of this particular project and the risk of the short-term loan agreement not being replaced and what the likelihood of the replace was and so on. So there's at least a great lack of symmetry of information with regard to risks that were at least of equal if not greater moment. And I think that that's what plaintiff's argument really hinges on is there were more disclosures about the short-term loan, so therefore the disclosures about the cross-collateralization agreement must have been false and misleading or must have been misleading because there weren't as many of them. But as the district court found persuasive and we believe as well, the cross-collateralization agreement was really a sub-risk of the greater risk of the short-term loan. And the fact that Geneva disclosed the existence of the cross-collateralization agreement put them on notice that, hey, here's something that is material to your investment and it's important enough that we're trying to obtain a release of that. They had the opportunity to ask any questions they wanted about the other two properties. Well, maybe a full disclosure would have required that information, the amounts to be laid out. This property was acquired for $14,255,000 and then it has an appraised value of almost an additional. In other words, its appraised value showed that it had already gone up $4 million. And then you think about a short-term loan, you know, you don't think it's a big number, but it does give you the number of $13 million. And Prudential was the lead banker and the company used the proceeds from the short-term loan and cash to purchase the property. But we don't know what encumbrances were on the property that was part of this cross-collateralization agreement, do we, if we read this? Well, we know that there was a cross-collateralization agreement, which was an encumbrance on all three properties. Yeah, but we don't know on the other two. Well, we know that they borrowed $13 million to buy the property and that it had gone up already $4 million, but we don't know if it was the $13 million. Was that used to buy all three properties? No, Your Honor. So it wasn't. And so you look at the cross-collateralization, then wouldn't you need to know how much is, whether the other two properties are encumbered and to what extent? How much were they, what was the encumbrance on those two together, total? Geneva purchased the three properties as part of, I guess, a suite of properties. The total purchase price for the three of them was approximately $26.5 million. The seller that sold the properties to Geneva allocated a price of $14.5 million to Beamer Place. That was just a price that they allocated to it. For their own tax purposes or whatever? That's what we presume, yes. And so defendants were, excuse me, plaintiffs were put on notice that the three properties were purchased for $26 million. They were put on notice that Geneva did purchase three properties together. They knew that Beamer Place was cross-collateralized with the other two properties. So really what we're left with is plaintiffs arguing that they were entitled to more information about the two other properties, and this really does get us back to the duty of completeness that you discussed earlier. What were the encumbrances on the other two? When you say the encumbrances, do you mean the loans? Which was owing on them. I'm not sure, Your Honor. They had separate loans for those other two properties. Well, you don't know, let's say you've got property one, two, and three, and they bought into the third. So what was owing on those? I don't know, Your Honor. It's not in the record, and I don't think it's necessarily relevant to this case for the simple reason that the plaintiffs only purchased an investment in Beamer Place. They're suggesting that somehow this meant that they were responsible for more than just the mortgage on Beamer Place. They weren't. Any deficiency judgment on the other two properties is not their responsibility. The material point is just that Beamer Place was cross-collateralized with the other two properties. They were put on notice about those other two properties, and if they had any questions or concerns about... Well, if they'd asked, are those other two properties free and clear? I don't believe so. I think that they had a similar situation where they had a short-term loan on them, and Geneva was seeking permanent financing, and then the real estate market collapsed and the lending markets collapsed, so Geneva was unable to secure a lease for those properties as well. So actually, there wasn't full disclosure of the risk. Well, the disclosure was that Beamer Place was cross-collateralized. Beamer Place was cross-collateralized, and we know that what was Beamer Place price allocated to the property by the property seller was $14 million, and the appraised value was $18.5. So is that just on Beamer? The 14-point whatever that was, yes, that was just the price allocated to Beamer. To Beamer? And the $18.5 million was the appraisal on Beamer in 2007. Yeah, okay. But Beamer is wedded to two other pieces of property. They're just all together. That's right, and that was disclosed in the private placement memorandum. Okay. They didn't know what the encumbrance was on the other two? No, they didn't ask. Well, aren't you supposed to disclose that? I think what we were supposed to disclose was that there was a cross-collateralization agreement. This really just gets us back to – Can I just get to my question, which is related to this? Yeah, okay. The duty to disclose comes from somewhere else, right? Where is it coming from? When Mr. Slavens brought that up in his reply brief, I'm not really sure what he's trying to argue because this is a 10b-5 case. I understand this is a 10b-5. On the other hand, you did submit a 100-page prospectus, presumably because you have some obligation to do that. Is it under another piece of the Securities Act or where? I'm not sure, Your Honor. I believe that this was an exemption to the securities rules, this offering, so that's why it was a private placement memorandum. I don't believe that the SEC – California law? I mean, Texas law maybe? I'm not sure. I suppose you had done none of it. I suppose you had just said, we're selling whatever this thing in Beamer Place, so if you want it, you can have it. And if you have any questions, ask us. That would not be a 10b-5 problem. It's still a security, so if they were selling a security, if they made any false or misleading statements or omissions – I know, but suppose they just said what I said. There is a property on the corner of such-and-such-and-such-and-such in Houston, Texas. If you want to know anything about it, ask us, and we're selling investments in it for $300,000 apiece. I'm not sure, Your Honor. What I do know is that – what I think this really comes down to is – and what Mr. Slavens is saying is, did we disclose the material information that we needed to disclose? And I think the answer is yes. We disclosed the existence of the cross-collateralization agreement. That's right. I don't know how to answer that question unless I know where – he makes a not completely incogent argument that Brody was about a press release where you wouldn't expect to know everything, and this is about a perspective as to which you would expect that something that isn't there doesn't matter, so that omissions have more of a misleading impact. In this context, and to evaluate that – I mean, that sort of sounds plausible. I don't know any case law supporting it. He keeps citing this recent WPP Luxembourg case, which does seem to say that the suppression of relevant information in a very particular context can be a 10b-5 problem. So I'm having trouble seeing how the pieces fit together. Well, in Brody, I actually think that this case is stronger than Brody because in Brody, the company that had the information and did not disclose the information in the press release was the only entity that had possession of that information. In this case, not only did Geneva disclose the existence of the cross-collateralization agreement, but the plaintiffs, if they had any questions or concerns about what that meant, because that really seems to be what plaintiff is saying, is we didn't know what the risks were of a cross-collateralization agreement. If they had any questions about that, they had all the resources in the world to figure out what that meant, and that's very different from Brody, where a publicly held company, the investors there only had the press releases to work with, whereas here, there's a whole world of information. They could have asked Geneva. They could have asked to see the cross-collateralization agreement. They could have asked Berthel Fisher. They could have asked their lawyers. All of these things were encouraged to them in the PPM. So I actually think that the PPM really put them on notice of all the risks and advised them that they needed to do more due diligence, which they have never alleged that they did. So what's on that first page, in bold type, the interest offered hereby are highly speculative. That would have been enough. No, I don't think that's enough. And I think that plaintiffs spent some time. Whether it's enough or not enough depends on where any affirmative obligation comes from. I find it impossible to evaluate this case in this weird vacuum. It might be enough. Maybe you could just tell them that and nothing else, and that might be enough if you have no other affirmative obligation. I think that if Geneva had not disclosed the existence of the cross-collateralization agreement, that would likely have been a material omission because it would implicate the other disclosures that were made about the obligations on the property. In other words, the notion is that there really is in some context a rule of completeness. If it's misleading, do not give the information. I don't think there is a rule of completeness. I think the question is. There's a rule of material omission, which is different than completeness. That is 10b and 10b-5 cover both affirmative representations and material omissions that are fraudulent or misleading. That's right. In this case, the plaintiff seems to have alleged both affirmative misleading statements and omissions, and that really gets us back to what is a fraudulent omission. As I understand it, the sort of joining point between material omission and the rule of completeness would be this. If something is left out that should be in, and it's material to the risk and the understanding of the investment, that can be a 10b-5 violation. If something is disclosed but not with a lot of information attached to it, that's just a different animal. I think that's right, Your Honor. Why isn't there a material omission that there is to know? Maybe he doesn't allege this, that these other properties were shaky. Let's suppose the other properties were shaky at the time, and that wasn't disclosed. For there to be a material omission, Rule 10b-5 states very clearly that it's illegal to omit to state a material fact necessary in order to make the statements made not misleading. So to be actionable, the omission has to both relate to the affirmative statement and contradict the affirmative statement. And I believe that's what this court- But overall, and this is what's disturbing about it, overall the prospectus appear to be telling you what you needed to know about the riskiness or lack thereof of what you were buying. But in fact, I'm hypothesizing now, if these collateralized other properties were about to go under, it would seem that that was at least as material as what was disclosed, and leaving it out what could certainly appear to be a material omission in the sense that you had the appearance of knowing what you needed to know to assess the riskiness, but really you didn't. Well, I think that if that were true, and we knew that the other properties were about to go under, that clearly impacts the ability of the Beamer Place investment to survive. And so, therefore, the two relate. The omission about the risk of the other two properties about to go under does relate to statements that the Beamer Place PPM made about the Beamer Place PPM. But here they've not alleged that there was any such situation with those other two properties. They've alleged no facts in that regard at all. What they're really saying is, we should have received more information about what the cross-collateralization agreement meant, and more information about the other two properties. But the omissions that they claim don't contradict the state of affairs, in the words of Brody, that was currently in place. They don't suggest that there wasn't a cross-collateralization agreement. They don't suggest that Geneva was not in the process of obtaining it. And they don't suggest that a release was either impossible or unlikely. They just wanted more information, and they weren't entitled to it. Yeah. You know, when you kind of look at this, you know, when you read it, it talks about this Beeman. I mean, we're thinking about the Beeman property. And here on page 7 of this, 71 or whatever it is, it says the price allocated to the property by the seller was $14 million, et cetera. The appraised value of the property times the property purchase. In other words, they appraised it. The price allocated, which tells me that, I don't know, first I'm not sure why they're using the term allocated. So it gives you the impression that, well, we got it for $14 million, and the time we got it, hell, it was worth $18 million. So we're pretty good, smart guys, you know. We already made $4 million, you know. And so you might think, well, if you've got this cross-collateralization, hell, they made money on that, too. Your Honor, I'm not... Is there anything in here about they bought all this stuff together and then they had the seller make the allocations and all that history? It is in there. I believe the record site is 71. And I think there is the disclosure that they purchased all three properties for approximately $26 million. They gave all the information about the purchase price that was allocated by the seller.  And that it was just the purchase price that they essentially came up with. It's not a representation that Beamer Place was appraised at $14.5 million at that time. I think Geneva probably thought it was getting a good deal. But that doesn't state a claim for securities fraud. And I think, at least as to the representations about the appraisal, plaintiffs are suggesting that the 2007 appraisal of $18.5 million somehow later becomes misleading and fraudulent if the property isn't worth the same a year and a half later. Plaintiffs were given several data points that they could try to figure out what the value of Beamer Place was. If the Court has no further questions, I will let Counsel for Berthel Fisher speak up. I'm sorry for running over my time. Thank you. All right. They sent you out as the point man. It's a dangerous position. That's what I said, too. That's what they do, these guys. They sit back there and they sent the little girls out. She needs to gain experience, Your Honor. What? She needs to gain experience. That's how you do it. Sometimes they get shot down. May it please the Court, my name is Steve Holtman. I'm here on behalf of Berthel Fisher. I know we're running late, so I'll be very brief. Let me see if I can answer some of these questions. At least I can tell you what our position is. First of all, in terms of an affirmative duty to disclose, you need to keep in mind these are what we call accredited investors. They're all millionaires. And under the securities law umbrella, Congress feels that millionaires have a better opportunity to take care of themselves than I'm being from Iowa. You heard of the little old lady from Dubuque. We've got a lot of smart people in Iowa. You're not a country boy, I am. So the point being, we could absolutely sell this without saying anything. There is no duty to disclose in this type of a transaction dealing with accredited investors under the securities laws. Any duty you have comes essentially from your conclusion, from your decision to say a fair amount, 100 pages worth, and any implication from an omission that might make what you did disclose appear misleading. That's right. That's it. We could have gone to these people and just simply given them one sheet of piece of paper which says you can purchase one of these tenant in common interest for $500,000. Send your money no later than two weeks from today, period. Hopefully, and if you want to know anything, call so-and-so. That's right. And that's it. But then if we do speak, as Judge Berzon said, if we do, well, then you're into another world of, well, you have to speak truthfully and you cannot leave out material omissions. And the question is, does there come a point at which the very, which may, and I understand be counterproductive to encouraging more revelations, but the very density of this document create the impression that we've told you everything you really need to know. And therefore, and you really don't need to know anything about this cross-collateralization agreement because it's not, it's going away. Well, I don't know where you ever draw the line on that. I mean, that gets into, I think that gets back to what Congress was trying to do when it passed the PSLRA in terms of a heightened pleading standard of trying to prevent this Monday morning quarterbacking which people in our position face all the time. I submit to you that probably even if we had a risk disclosure on this cross-collateralization agreement, we'd still be here because they would have said, well, it wasn't, the disclosure should have been at the beginning of the risk disclosures. In other words, we have 25 risk disclosures. Is that what it's come to, that every time you go through these documents and you say something, you have to have a separate risk disclosure? We could have 25 risk disclosures and they'd say, yeah, but it's buried. It's buried in the middle. Why isn't it simply dispositive that they never allege anything about what the risk disclosure would have disclosed? That's right. For all we know, it would have disclosed that these were great properties and there was absolutely nothing wrong with them. That's right. So, I mean, we can't win for losing in these types of situations. If we don't say anything, well, then we have to go through a two-year- But what, in fact, what the risk disclosure would have disclosed was that nobody was buying these things or no one was renting them. There was a huge loss on those other two properties and probably they weren't going to be paying their loans back. Well, yeah, I mean, they could have said, but there's no allegation of that. I understand. I'm just wondering what if there were? Well, if we had made that disclosure? No, if they had now alleged that that's what you would have disclosed if you disclosed it. That's what was the truth at the time. Well, that's an interesting question. I think so, too. So what's the answer? I think in that circumstances, certainly if I'm the attorney advising my client, we would have made sure that that type of disclosure didn't. If that's the factual situation, that would have been disclosed. I think the underlying problem here is that this offering was prepared at a time before the real estate market completely collapsed, and it did. And so given the timing, I'm not sure what a more elaborate statement would have disclosed, but not necessarily that the other properties were in a problem state at that time. We don't know. We just don't know. I mean, but this has been a moving target all along because when this case was first tried, their first complaint was, well, you told us about the cross-collateralization agreement, but you did it in one sentence, and that's not enough. And that's what they complained about. You should have mentioned it. Well, I don't know. How many times should we have mentioned it? Well, that's still their complaint. They're just saying they wanted a whole paragraph of detail about what it meant beyond relating it back to the earlier paragraph on the same page about the other property. I appreciate that, Judge, but what I'm trying to say is the progression, how it's been a moving target. And then they discovered it was mentioned actually twice. Twice, right. So now then they moved on from that to the fact, well, okay, there should have been – they went to the in-process language. That means to us that this was a done deal. Well, they didn't really say that. I said that. Well, I know, but that's in there. I mean, you know, to them, to a reasonable person, that would have meant that this is a done deal. And we obviously, for the reasons Ms. Semmer talked about at length, disagree with that. And what they have to come up with is that we omitted something which would make that affirmative statement misleading. And they have nothing. There is no allegation, and that's what the PSLRA would require, that there be some type of an allegation of that. And so then they move on from that to now they want a full risk disclosure. So that's been the evolution of this. Well, lawsuits are living organisms. You know that. They keep changing. But I think a key point – Why don't you put in the encumbrance on the other two properties so they could see it? They just sounded to me like, well, you know, we've got this cross-collateralization and we're working to take care of it. It sounded like, you know, okay, it's going to be okay. And, you know, we just got a short-term loan. Well, in hindsight, Your Honor, I mean, sure, I suppose we could have put a lot of things in here. Mark Twain said, when in doubt, tell the truth. That's right. But that's my point. I don't think there's – when it gets back to it, there's nothing that's false in this. And they have admitted that we haven't made false statements. They just, as Ms. Semmer emphasized, and I agree fully, they just want more information. And this case is absolutely controlled and respectfully by the Brody opinion. And I think that's the way the court can and should dispose of this. And I want to emphasize again, whenever the cross-collateralization was mentioned, as Judge Graber said, it was always in the same paragraph as the short-term loan and the implications of the short-term loan and what's going to happen if the short-term loan fails or doesn't get refinanced into permanent financing. You could lose everything. And that's repeated throughout this document with these accredited investors. But it isn't said that you could also lose everything even if – through the cross-collateralization agreement, even if the loan doesn't fail, the short-term loan in general doesn't fail, our short-term loan for this particular property. Well, that's true. That's the basic underlying complaint. And the agreements are separate and the prospectus says they're separate. It says in addition. Well, it does, but that's all truthful, though. It's all true. So all I'm saying is that it doesn't appear to me that the discussion of the short-term loan independently is terribly relevant because this could have independently caused a problem. It did independently cause a problem. And while fixing the short-term loan would have fixed it, not fixing it would not necessarily have created this problem. That's true. Thank you, Your Honors. Thank you. Yeah, sure. The only point I'd like to make to the Court is that the duty to disclose is under 10b-5 applicable. I've got Ninth Circuit precedent, Spectrum Financial Companies, which we cited in our reply brief. And it says under heading duty to disclose, beyond the issue of whether or not appellees were reckless is the question of whether they had any duty to disclose material information to appellants. And then they go on to cite Wig versus Hurst and identify factors that are relevant in determining the scope of the duty to disclose material facts under 10b-5. Okay, so 10b-5 does incorporate a duty to disclose under Ninth Circuit precedence if those factors are met. And we believe they're met here, which we analyze in our reply brief. Does it matter at all which case we are talking about now? Spectrum Financial. Does it matter at all that you have not said what would have been disclosed that would have made any difference? What we do say what would have been disclosed, and what would have been disclosed is the terms and conditions and the financial viability of the other properties. Well, the terms and conditions are only, don't seem to be the problem. The problem seems, or at least they're implicit in what a cross-default, cross-collateralization agreement means. So unless you could allege that there was something about the conditions of those properties at the time, that withholding was a material omission, I don't know where you are. And you haven't done that. The fact that you are now responsible for another mortgage out there. That is said, or at least can be divined. What isn't said is if there's something wrong with those properties, or if the risk of them is greater than the risk that's otherwise disclosed. But you've never alleged that. That can be inferred from the complaint. How can it be inferred from the complaint? Because that is essentially the problem. The problem is that it failed. The problem isn't that it was, it would have been apparent from something that could have been revealed at the time that it was going to fail. Well, that would be a policy of the court requiring the plaintiff to know something they have no possible basis to know. Then you lose. Because if the collapse of the real estate market was not known to the offerers of the security, then how could they be expected to tell you? That's just, I mean, you're really making your opponent's point by saying that how could they possibly know that everything was going to fall apart in two years? And if they didn't have reason to know it at the time of the offering, then there was nothing more to disclose. Well, you have the fact that Beamer Place didn't collapse. Beamer Place was making its payments. The other two properties are the ones that failed. That doesn't mean it was known two years previously to the failing. I mean, that seems to me to be the hole in your case. I mean, we've basically gotten your opponents to agree that if there was something about those properties that made them inherently known to be risky at the time, then there may have been a material omission. But you haven't alleged that. Well, I mean, it gets back to the same point you've been making, is that why did they disclose all this other information about the Beamer Place properties? Because they have a duty to disclose. Well, their view is because we didn't think there was anything, any particular risk involved with them, or at least you haven't said there was. And we really thought that this was going to be eliminated, and you haven't said otherwise. You haven't actually alleged that the impression created by that sentence, i.e., this is about to be, we're about to get rid of this. We really think we're about to get rid of this. That's not true. What I've said, what we've alleged is that by presenting it that way, not giving any disclosures about it throughout the PPM, there was an effort by the offeror to downplay the CC agreement, to distract investors from asking about it and inquiring about it, and basically putting it out of the minds of investors. And that, coupled with the fact that they've disclosed all this information about the property itself, the risks involved in that property, without any discussion about the risks of the other property, that's the problem. The property may have been making its payments at that time, but there are risks associated with those other properties, and they didn't disclose those risks. And those risks are material to investors in order to evaluate the overall risks of the property. Did they describe the overall scheme here with the three properties, and buying them all, and how the values were allocated? Yes, they did. But they didn't describe that in connection with the cross-collateralization agreement. And again, they presented the cross-collateralization agreement. They swept it under the rug, saying, don't worry, we're going to get rid of this. You haven't even alleged that it wasn't true. What? You haven't even alleged that that much wasn't true. It's how it was presented. Okay. If I want you to believe something is important, I not only talk about it in one sentence and say that it's going to be released, or I'm in the process of releasing it, but I also talk about it as they did with the short-term loan. I also talk about what happens if it's not released. That's important for investors to know. They need to know what happens if that doesn't happen. It goes back to the bespeak structure. I mean, I gather to somebody who reads real estate documents, cross-collateralization and cross-default means that. It means that. And the amount of it is on the same page. You know that about half the value of this purchase is in Beamer Place, and about half the value is in these other properties, and that they're cross-defaults. So if the other one's default, you know from looking at this by the arithmetic that the entirety of Beamer Place could go away because it's about the same as the other two properties. That's why we – the problem we have with the sentence is, number one, in the same sentence they say it's in the process of being released. Which was true. They thought it was true at the time. So leave that aside. And then they don't have any discussion about it whatsoever after that. If you look at the entire document, you can – it's the impression given to investors is that this CC agreement is of little value, of meaningless. It's something that's – That's – well, I don't see that in the document, but I guess everybody reads it their own way. Well, it's not in the document. That's the problem. Anyway, this was a useful argument in a complicated case. Thanks. Thank you. Thank you. Yeah. All right. Matt is submitted. Final comment? You want to say something? Yes, please. Yeah. All right. Thank you very much. I just wanted to briefly address your concern that what if these properties were underwater or there was something else horribly wrong with these properties? There is something very clear in the record that would suggest that that was not true, namely that Prudential would not have contemplated a release of the cross-collateralization agreement if the other properties were at risk of default because they are most protected when that cross-collateralization agreement is in place. And if other two properties are failing, they're going to want to keep that in place, and they've acknowledged that they contemplated a release as well. Thank you. Thank you, Your Honors. They don't really know what Prudential had in its mind. They may have been out playing golf someplace. Well, they at least objectively represented to both the investors who received the due diligence package with that letter and to Geneva that they were contemplating a release of that agreement. Okay. Thank you very much. Yes. Okay, we'll come to the last matter on today's calendar.
judges: Pregerson, Graber, Berzon